Case 11-0687, SMG, Inc. v. Nathan's Famous Systems, Inc. And if both attorneys that are going to present argument would step up and identify yourselves for the record. Good morning, Your Honor. Lisa Saulbacken from Arkansas Backen, representing appellant Nathan's Famous Systems, Inc. Good morning. Lizara Rinal for SMG. I'm sorry, counsel, could you state your name again? Sure. It's Lisa Saulbacken. S as in Sam, O-L, B as in boy, A, K-K, E, N as in name. You're not on the briefs, are you? No. Well, my, quite as well. Our former firm is. Arkansas Backen is the firm that followed Arkin Kaplan Rice. Okay. Saulbacken. Saulbacken. All right. Okay. Now, I'm sure you've heard this earlier, but if you haven't, we'll allow each side approximately 15 minutes to present their arguments. And from that, Ms. Saulbacken, you may save out some time for rebuttal. I'd like to do that, Your Honor, on three minutes. Sure. All right. You may proceed. Thank you. May it please the Court. There are two issues on appeal today. The first pertains to whether or not the trial court erred as a matter of law when it determined that parole evidence precluded evidence pertaining to royalties or uncontradicted evidence reflecting that Nathans and a third party here, that would be Morrell, treated amounts received by Nathans as royalties pursuant to a separate contract, not with SMG here. SMG took the position that because those amounts were defined in a contract with Morrell as discounts or rebates, that that is the construction that should be applied by the court. Could you, I'm having trouble finding the other provision that relates to these parties. The other provision being 4.2, Your Honor? No, no, the provision relating to the price that the SMG. 210. Where in the briefs is it? It's not like easily. Oh, in the actual briefs. Where is it in these briefs? I'm referring to our brief. Either side can help out here. In the other one or something. Okay. I'm just looking down and it's, I believe you, that we're talking, I think I'm looking at page nine. Nine of your opening brief? Of our opening brief. I just want to make sure this is, oh, this is the 97 letter agreement that we refer to. Yeah, I'm not talking about the agreement between Morrell and Nathans. You're talking about the 94 agreement. I'm talking about the agreement that SMG has in terms of what it's going to pay for the spices. Okay, that's on page four of our brief. We discussed that. And if you look at page five, we address in particular the construction of section 2.10 of the license. What other page did you say? If you look at page four, Your Honor. Yeah, I'm looking at that. And then if you flip over from there to sort of a carryover paragraph. Yeah. Provides that under the license agreement, Nathans could charge SMG no more than its actual cost of obtaining seasoning from Morrell before deducting royalties payable by Nathans, payable to Nathans by Morrell. Okay, is that the, that's the only place that the full paragraph is, or the paragraph is listed? You know what, Your Honor, I'm not entirely sure if that's the only place. All right. It's certainly not the entire provision. No, okay. But, Your Honor, our position is that provision is actually fundamentally irrelevant, because the trigger right to what SMG was entitled to receive here is what was actually paid in fact to Nathans. Their right is derivative from their contract, not an entirely separate contract. Well, the gauge that SMG is gauging their costs are, it says we're going to buy our spices from your supplier, what is it, Morrell, but if we buy it directly from you, from Nathans, we only have to pay you what you get, you pay for it, except you can deduct from that cost the royalty that we owe. Now, you made an agreement in a 1997 letter, and part of that agreement says, Morrell will have no responsibility to pay royalties to Nathans, or sales made to Nathans. So doesn't that change the pricing that should have been charged to SMG? Because the agreement says, plainly says, royalties, these are business people who deal with millions of dollars worth of goods a year, and shouldn't we hold them for what they say? Well, absolutely not, Your Honor, because here, first of all, they're the captains of their own document. You have Morrell and you have Nathans. You have Nathans stating a Morrell testimony says this is a royalty, Nathans testimony says this is a royalty, they're audited financials that are issued publicly say it's a royalty. Well, then why, why, why, why would the lawyers choose to change that language in a 1997 agreement? And, as a general rule, you can't go into parole evidence to explain what would otherwise be an unambiguous term. And that's what the trial court held. It held that in this 1997 agreement, there was a change in the language. That's usually done for a purpose. So, I mean, in terms of summary judgment, in terms of even trial, generally speaking, you're not allowed to go behind a document and put in parole evidence about what it supposedly means. I mean, that's kind of basic. That's actually, Your Honor, that does not apply in connection, and the New York law on this is very, very clear. Well, that's another thing I have a question about. The parties cite New York law, but I'm not sure, because the agreement says that, that New York law applies? It's not disputed that New York law applies. I think the case is cited by your opponent's state that, under New York law, you generally don't get to go into parole evidence to explain meanings of a contract. Is that kind of a basic principle in New York like it is here, or no? It's a basic principle in New York as to contracts existing between counterparties. Your Honor, the facts here are, this is not SMG and Nathans. This is Nathans and Morrell, an entirely separate party. And New York law is also perfectly clear that you do not apply the parole evidence rule there. Let me explain a practical reason why you can't do that. Because what if Nathans and Morrell in cahoots decided to call something royalties that was, in fact, a discount? That would leave them with absolutely no opportunity to challenge that. They'd have to wear that, too. Why did they change the language? Why did they suddenly stop using the word royalty, and why did they say specifically we no longer have to pay royalties? What is that all about? Well, Your Honor, it's a good question. It's not something addressed at the trial court level at all. So it's not in the record. No, but the language of the 1997 agreement, correct me if I'm wrong, says that Morrell is no longer going to be paying royalties to Nathans. Right, Your Honor. But, I mean, I don't understand. There's a real problem here when that language says what it says. And the trial judge said, I mean, I'm not going to start rewriting this language for you people. Well, that ignores New York law entirely. I don't know that it does, really. Well, we think that it does. I mean, contract law is pretty basic. The cases that have been cited as far as New York law pretty much say that you interpret contracts as written. I think that's kind of a general provision of general statement of the law wherever you are. You don't really add terms to contracts. You interpret them as written. The parties choose the words. So, I mean. Your Honor, with all due respect, even if they say that we're no longer responsible for paying royalties, what is that about? Tell us. Well, because at the time, you know, to the extent that the party, first of all, there's whether or not a discount and a royalty and a rebate are actually not all this, you know, entirely separate and distinct things. You'd have to assume that a discount, which was subsequently changed in amendments to this agreement to a rebate, are entirely unambiguous. I don't know, frankly, the way that this contract otherwise works. There's actual payments being made to Nathan's, which it kind of runs contrary to the common sense definition of a term discount, where the money actually never leaves your pocket. So, you know, you would initially have to find that those terms are, in fact, unambiguous, which, you know, frankly, we don't think they are. We think they are ambiguous. When you say we're no longer going to pay royalties, that's ambiguous? Right, because there's an entirely separate agreement that exists between the parties that does expressly reference a 10% royalty, from which that provision reasonably could be drawing a distinction between. So we're saying we're going to do 50 cents here, and that 10% is no longer happening. In 1997, was there a change in the basic agreement between, you know, Nathan's, and whatever, NFSI, if I have the name wrong, and Morrell, that suddenly this Morrell, if I'm saying that right, they were no longer going to be able to sell the spices to third parties. That was going to be taken back by Nathan's. That's right. So there was this change. Prior to that, this other agreement had allowed for the sale by Morrell to various third parties for the spice mixture. True. And they were paying a royalty on that, weren't they, to Nathan's? Correct. But this change came in 97, where Nathan's wanted to pull back, and they wanted to be in charge of anybody else that they were selling the spices to. Sure. Okay. And then in this 97 agreement, the parties, for whatever reason, decide to make a big break with the past, with the language, and they say, and this is a big change, too, in their agreement, because now Morrell is not allowed to sell to third parties. So they changed the agreement, and they also changed the words. And they say, we're no longer responsible for the payment of royalties to you. Your Honor, that's all true. Okay. But I will add to that, even assuming that to be true, New York law, which indisputably applies here, also provides parties can modify a contract by their performance. Yes. And did they do that in 97 when they came up with the new agreement, which pulled back Nathan's – it gave Nathan back its control to sell to other third parties, and Morrell sort of left out on that? I would say that they – Was that a big change in their agreement? Your Honor, that is not speaking to the performance that I'm referring to. The performance I'm referring to quite specifically is representing to people, including the federal government, who's applying taxes differently to royalties and discounts, what, in fact, these payments reflect. Now, they're entirely – SMG has no right to object to a party modifying their contract with an unrelated third party. And the court didn't even consider that here. Instead, they – But this word royalty was the barometer which governed how much they had to pay. And basically you said there's no such thing as a royalty to be paid by Morrell's to – That's not at all what I'm saying. What I'm saying is, listen, these people – That's what the 97 letter says. Right, and you know what? The parties are entitled – the parties to that contract are entitled to wholly ignore that, perform differently. Well, part of paying royalties, and I can see this, if Morrell is making this spice recipe that Nathan owns and is selling it to other parties, and they're saying I'm billing and I'm selling Nathan's – prior to Nathan's recipe, they have a right to charge a royalty for selling that to third parties. My question is, why would there be a royalty due if all Morrell is doing now is selling Nathan's recipe that is right back to Nathan's? They always did that, Your Honor. They always did that. Since 1986, and SMG knows this, there have always been royalties paid to Nathan's, even when – This isn't something unique to SMG. This isn't something unique to Morrell. This is the way Nathan's makes its – This is the way it makes its income, is largely through royalties. Royalties, incidentally, which they report on their finances. Well, what about their suggestion that this royalty would be 40% unheard of in the industry? You know, again, Your Honor, if they want to charge 40% as the royalty, and it increased over time, so at one point it wasn't consistently 40%, but they're entirely – there's nothing that that fact alone says in terms of what these amounts are. The parties to these contracts, if they want to agree to a 40% royalty – and by the way, Nathan's is a brand, right? Now, let's go back to the agreement that they have with SMG. Sure. Tell us again, you're saying it doesn't really matter what that language provides for? No. What I'm saying is that the language in the contract with Morrell doesn't matter in terms – Morrell has a right here. Excuse me, SMG has a right here. And if you look at Section 2.10, what it says quite specifically is amounts paid to Nathan's. It says amounts – so that means what, in fact, was paid to Nathan's. They don't get to call in this entirely separate contract and say this is dispositive of what, in fact, was paid to Nathan's. What does this provision again say? You've got it briefly mentioned on page 5. The actual cost. It says this provision states that SMG – prices payable to SMG to Nathan's shall not exceed the lower of Nathan's actual cost. Therefore, before deducting royalties payable to Nathan's by the spice manufacturer and why, which would be the price paid to Nathan's. Okay, so we do have to look at this in terms of the conduct between SMG and Nathan's. Correct. Whatever they're going to pay Nathan's, it has to be the lesser of, did you say? Yes, that's right, Your Honor. Of no more than its actual cost of Nathan's getting it from Morrell before deducting royalties. So does that mean that they have to include the royalties? That means that Nathan's gets the – yes, it gets to keep the benefit of the royalties, in other words. So it is kind of significant then vis-à-vis this SMG. Whether this provision, whether these amounts are royalties or not, you don't see that? I actually don't see that because what's happening here – How does the trial court come up with – you're not contesting the amount of the $5 million. Correct. You're just contesting that the court should never have granted summary judgment. Well, Your Honor, that's absolutely right. We're contending it's an error as a matter of law. And let me just say one thing. What we don't contest is that the 1997 agreement, they can come into court and they can say, this is one factor that you should be considering in connection with determining what, in fact, Nathan has received. But it's certainly not dispositive of Nathan. And more can it be because if the reverse would be true, well, then they really – How would they be able to challenge this other than to challenge whether the 1997 agreement and modifications subsequent to that continually referred to these changes as not royalties but rebates? Well, actually, the evidence shows that Nathan's referred to it as royalties. Morrell referred to it as royalties. They submit that this 1997 agreement refers to it as a discount or a rebate. There's evidence that reflects that internally at Morrell and Nathan's it was referenced as royalties. And frankly, what I think to be the most significant is it was accounted for by Nathan's publicly as royalties. Why did they change the language? No, all of this happened subsequent to that language, Your Honor. 1997, why did they change the language? Why did they change – there's any number of reasons why they changed the language. What's in the record is that, you know, there was some distinction being drawn from between the 10% of the royalties. And Your Honor had previously brought up the fact, well, why is Nathan's receiving it, you know, directly when they're – this is how it has happened. And in the past, it's received 10%. They're drawing a distinction from that prior practice. They're changing the way that they're doing it. But the reality is nothing else changed. And the fact that they don't go back and change this one word, while not – obviously not the best way to go, doesn't preclude these parties from modifying their contract orally, not in writing. They're entitled to do that. And what SMG has done is usurp that right. Now, is there something in your brief that they modified this orally? Well, we have the – Are you – where is that in your brief? That actually is in our brief. I think there was some general suggestion you can modify your agreement, but I don't know where or what you're basing this new theory on about they orally modified. At page 32 of our brief, Your Honor, we discussed this point. And just the title of that is trial court improperly ignored, a multi-year course of dealing. Course of dealing. Okay. All right. So you're saying – Course of dealing, performance, you know, the fact that – How many times did the 1997 letter get – You know, Your Honor, I think it was like three or four times. And did they continually use this same language, rebate? They did, Your Honor, because it wasn't an issue between Morell and Nathans. Morell and Nathans knew exactly what was going on because that's how they were accounting to Uncle Sam. That's what they were representing to their shareholders. All right. Okay. But they never involved SMG in the – Who doesn't claim to be a third-party beneficiary to this contract. Well, that's how they – in a way, though, they're interested because this royalty issue is what they have to pay. But, Your Honor, they never claim that they were a direct party that was supposed to receive this amount. Their trigger right is what, in fact, Nathans received. Because, again, the reverse of this, the reverse of this parole evidence applying to this, is that Nathans could completely avoid, let's just say avoid paying something by calling it a royalty, and they'd be similarly bound. It doesn't make sense. Their right to payment is how it was treated in fact. And I would submit, Your Honor, that that's precisely what New York law says in connection with third-party contracts, to which they are a stranger to. All right. Let's move on to your other – the trial. The trial court determined, Your Honor, that Section 4.2 of the contract with SMG here essentially contemplated a change in ownership such that convertible debentures that were issued in a 2006 refinancing, since they were, quote-unquote, debt instruments, they didn't constitute a change in ownership, and there was no trigger event. Therefore, Nathans could not terminate his contract. Now, how are we reviewing that? They actually say – we say de novo as to how the court interpreted the contract. They say a mixed question of law or fact. We're happy to defer to a question of mixed law and fact. You're happy to defer. Well, both of you could be wrong. Both of us could be wrong. This could be a manifest way. This was a bench trial. It was conducted in Illinois. And procedurally, I'm just saying I don't – I'm not sure – I certainly don't agree that this would be a question of de novo review after a five-day bench trial in front of a judge who heard all the evidence and listened to the witnesses testify. That's fine, Your Honor. Clearly, erroneous is generally used in our administrative law cases. There are cases that suggest when the court is interpreting facts based on a contract interpretation here. So I'm not sure either one of you have the correct standard of review. Either way. Either way, Your Honor. What we would submit is that even if it is manifest way to the evidence, that the manifest way to the evidence is as follows. There's two ways that Section 4.2 contemplates. I'm going to use the term trigger event again. One way is when there is a transfer of all or substantially all of the assets and the business or another disposition of the same. And the other way is a transfer of 40 percent of the voting shares of this company. Now, these convertible debentures. Now, I'll stop you right there. Under clear error, when we talk about whether these facts amounted to a sale of assets or whether we talk about whether this was a 40 percent transfer. A 40 percent transfer, Your Honor, of the voting shares. Now we're at the manifest way. The court heard the facts about whether these transactions amounted to sale or whether they were a 40 percent provision triggering event. Under manifest way, your argument would be that no rational prior fact could have concluded what the trial judge concluded here. That's my argument, Your Honor. And the reason for that argument. Is SMG still the owner of the plant? Yeah, they own the physical assets. Do they have the license? I mean, they have the license agreement until what, next year? That's correct, Your Honor. And then they have, what else do they have in Chicago? That's where they're operating. Yes, that's right. Does that ever change throughout these whole proceedings? Absolutely not, but the voting shares did, Your Honor. And we would submit to you that in terms of the voting shares, it's who puts who on the board that matters. What case says that? Well, Your Honor, this is a finding of fact. There's no legal ruling precisely on the point. But you have to support your position with legal authority. Right, and we would say that the intent of, let me back up and get there for you. Because in my view, you have to look at the intent of the parties here. Nobody's really disputing that. Nobody's also disputing the fact that what Nathan's is trying to accomplish is some measure of protection over its brand. It licenses things out. So, frankly, if there's a thumb in a hot dog at the end of the day, that brings down the entire company. They have an interest in knowing who is producing these products with their name on it. So they devise 4.2, which has language. Has that really changed in this case who's been producing this at that plant here in Chicago? Well, if it matters, Your Honor, who is the boss of those people who are actually producing it, then it has, in fact, changed. Okay, and isn't he the same person that's always been there, Mr. Shishler? No, the CEO, for example. Who's the guy that's running the shop? I believe that Mr. Shishler is still there. He's been there forever, hasn't he? But he reports to the CEO who has, in fact, changed and was actually put in, coincidentally, by the debenture holders. Are you saying the change of the CEO was a change of ownership? No, what I'm saying is the ability to identify and put in place is a hallmark of ownership and, in fact, reflects that the voting was transferred. The voting, they actually split, they stripped from shares the right to vote for the board. Now, this board has a fiduciary duty to its equity holders, its actual shareholders, okay? Now, they're put in by these creditors pursuant to this loan theory, but I'm unsure of anything else. Did anybody's shares change hands? The actual shares did not. Everything important about those shares did. Okay, the shares never changed hands. No, those shares did not. Is taking out a loan, in your opinion, a transfer of ownership? Well, Your Honor, when I take out a loan from the bank to buy a house, the bank doesn't come in and tell me how to decorate my house. The bank doesn't come in and tell me who's going to watch my kids. Does this agreement suggest that taking out a loan is a transfer of ownership? No, but it's not a loan. Not a loan. At some point, the lawyer for SMG wrote a letter to Nathan's executive and detailed exactly what was going to take place. They disavowed that a notice was required. Correct. But they said X, Y, and Z is going to take place. Isn't that sufficient? Then you had a certain period of time within which to object and not object. Your Honor, we actually disagree that they identified precisely what was happening here, and they did, in fact, say, by the way, this is not a triggering event in front of 4.2. And in terms of the tolling argument that they make in their brief, there's a case, a New York case, directly on point, Hutchinson, I believe, is the name of it, which provides, like, listen, you don't get to say that the time expired for something if they actually never submitted notice to us. They don't get to do that as a matter of law. Well, what they're saying, we're doing this, but because we're conducting our business in this manner, we don't feel it's a violation of 4.2, but for whatever you think is worth, here it is. And it's up to you, then, to disagree with that opinion. Well, Your Honor, we were chasing them around for, as the record reflects, we were chasing them around for more information in connection with this transaction for basically a year. The notion that we weren't interested in ascertaining the ins and the outs of this thing, which is very important to Nathan's, you know, it's belied by the record. And the reality is they just simply don't get to make that argument as a matter of law, this tolling and the fact that they, you know, our time expired. If you don't issue notice, if you don't own up to that notice, you don't get to do this wishy-washy, oh, well, we kind of noticed you, but we kind of didn't, guess what, you're out of time. Well, what specifically is required under 4.2 in terms of the notice? What is not, you're not required to say headline, we're going to hereby put on notice that we've changed ownership. They're not required to do that, are they? No, but they've got to own up to the fact that it's an event that requires notice. That's the whole purpose of the notice, so that everybody's on the same page. They get the notice and they say to themselves, okay, do I consent to this process? But here's what they're saying. They say we're taking out money and we're going to issue these debentures and this is what's going to happen, but we don't think it valid 4.2, but this is what we're going to do. Isn't it up to you to then? Well, the problem, here's the problem with those debentures, Your Honor. They're a very unusual debenture. Debentures usually don't come with voting rights, certainly not 92% of voting rights. So the notion that they said, hey, we're going to issue some debentures, we're going to have a refinancing just like it was in 2004, that's not what happened. They issued debentures that were special debentures. So why wasn't there an objection then? Because, Your Honor, we were literally, their notice doesn't say, doesn't provide the ins and the outs of this transaction, and we think, you know, we believe our brief sets forth the reasons why. What gives you an extension of time to object later? The time never started, Your Honor. If you don't notice somebody, how is their time going to start? Well, they gave you some notice, but you're saying it wasn't noticed. They don't say they gave a notice. They take a position contrary to that in the lower court. They say we didn't give notice. Well, you certainly recognize that 4.2 was indicated here because you asked for an extension of that time, right? Yeah, well, listen, understandably they're trying to protect themselves, but that doesn't save these guys from saying we're not noticing you. It's entirely unjust. Well, you knew it was implicated because your client asked for time to extend. We knew it was implicated, but they dispute to this day that it was ever protected. Exactly. Their position is that we didn't do anything that violated 4.2. They're saying this is what we're going to do, and the onus is on you to say we object. No, what we have to do is consent to something. They have to notice the event, and then we either consent or we don't or we try to work with them. Maybe we need indemnification in some respects, given that they're stripping voting rights from shareholders or something like that. But we are entitled to be on – these are commercial entities that are entitled. They've got to own up. He has to essentially say, listen, this is a transaction that we believe triggers it. Here's the facts that we need. But that's the point. They don't think it triggered it. Their position today is that what they did did not trigger 4.2. Precisely. So there's no tolling because we had no obligation, and we have to argue now that the facts suggest to the contrary. Listen, I'm not disputing that. It's a tough burden. It's a manifest way to the evidence. But what we're saying is, no, in fact, the trial court got that wrong. It was a trigger. Well, here's the problem. If you disagree with their opinion that there was tolling, how do they know that? How can they do anything to it? Well, how do they know that? First of all, if you wanted to talk truly about the equities and take out the controlling New York law, which says that you first have to notice before any other party is obligated, assuming that that law didn't exist, we did, in fact, chase them around with the particulars of this transaction. It's not like – and I don't even think that they argue, Your Honor, that we sat on our hands. You know, they argue something really different. And I see Your Honor's looking at the clock, and I appreciate the additional time. You'll have a few minutes before we vote. All right? Good morning. My name, again, is Lazar Reynal, and I have the pleasure of representing SMG in this case. I just wanted to start by asking the question sort of why are we here, because normally when we're in a lawsuit and we have these types of disputes between business partners, something bad has happened, like the thumb in the hot dog or some other thing like that. Nothing bad has happened here. These are our business partners. Well, it's kind of bad now, because wasn't this a licensing agreement that it's going to expire in 2014? It's going to expire in 2014. And obviously it's all down the tubes now, right? No, no. The companies continue to negotiate. Are you negotiating an extension or a future license after 2014? The parties have discussions about that all the time, Your Honor. Oh, okay. So do they have discussions about resolving this, too, then? In the sense of, you know. Maybe we should just take this under advisement for a while. I hope so. Well, look, they are our business partners. Well, that's really sad, then. If you're in the business of renegotiating a possible license in the future and you're fighting here about the $5 million, I don't know how that goes to help that future relationship blossom further. It would seem to me that everything is just, you know, cooked. Well, you know, Your Honor, I'm not part of those negotiations, so I don't foretell or tell you how it goes. But anyway, you said normally this wouldn't happen unless something terrible. Something bad had happened. Like there had been a thumb in the hot dog. There had been Mr. Shishler, you know, or whoever his replacement is when he's retired, was doing a bad job. There were quality concerns. All of the evidence indicates over and over was that our performance has been spectacular, that there are zero complaints about quality, delivery, growth of product. Our client makes the hot dogs. They sell the hot dogs. They package the hot dogs. They market the hot dogs. This is a license agreement where we pay a royalty to them for the privilege of being able to manufacture the hot dogs, put them in packages, and go out and sell them to retail establishments. What's the royalty that you pay them? What's that amount, would you say? Oh, I apologize, Your Honor. I don't know it off the top of my head as to what we pay them on the royalty. We pay them a royalty to manufacture and sell Nathan's hot dogs. Correct. You also buy Nathan's, the spice mix. Correct. And you buy it directly from Nathan's now. Yes, now we do. Yes. Originally in 1994 when SMG became a stand-alone company, the relationship, and there was a change in 97, Your Honor, since you asked about that, I'll tell you what it was. In 94, the agreement, which is, and the agreement, by the way, the language since you had asked, Your Honor, is at pages 15 and 37 of our brief. It's actually page 16 that we cite, paragraph 2.10. And 2.10, what 2.10 says, if you look at the full agreement. It's not on 37, at least not the full language. On the SMG brief, we start section 2.10 on page 15, and as it rolls over to 16, we quote the language. But what the contract says between SMG and Nathan's is we have to buy the spice either directly from you, Nathan's, or from your spice manufacturer. And in 94, what the contract says, the only spice manufacturer is Morrell. Right. So we're currently going to buy from Morrell. Yes. And our rights going forward is either we can only buy from the manufacturer or from you. In 97, Nathan's, under its right, under our agreement, they said, You're now only going to buy from us. You're not going to buy from Morrell anymore. So you're not going to be invoiced from Morrell anymore. You're not going to have any input as to what the negotiations are over costs or anything. And when we were buying directly from Morrell, Morrell obviously would pay them a license because they were using the Nathan's branded spice, whatever. When Nathan's decided, for whatever reasons under its right, to take that control, to buy the spice directly and then sell to us, there's absolutely no reason for a royalty anymore because Nathan's is buying it directly from Morrell and turning around and selling it to us. So what would you call, really, this whole idea that Nathan's has given Morrell the right to manufacture its spice? Then they sell it back to Nathan's, right? Well, what is that that they're giving them? Well, it's just like an OEM agreement. I know, but isn't it royalty, really? I mean, aren't they paying them a royalty to be able to create the mixture and then sell it back to them? So they have to give them something, don't they, for this right to be able to do it? Well, it all depends on how you want to construct it. They don't have to, Your Honor. You want to have control over it. You want to buy it yourself. But what's in this for Morrell? They're making money, right? Right. Morrell is selling it. Morrell is selling a spice mixture back to Nathan's, right? Right. Morrell is allowed to mark it up. Morrell is allowed to say, it costs us X, and we're going to sell it for Y, and they sell it to Y. Whatever they make, they're selling back to Nathan's, true? Right. So what is that that they're paying them? What they're paying? Nathan's is paying them. Nathan's is buying the spice from them. They're not paying Nathan's anything. Yeah, but they're making the spice, right? But it's Nathan's spice mixture, right? They gave them the right to make it and then sell it back to them. Well, it's not the same. It's not the same as a license agreement where we say, we license you the ability to make it and go sell it to others. Right. With our name on it, so you pay us a royalty. As opposed to, you're going to be my manufacturer now. You're going to sell it to me, and then I'm going to sell it. Okay, well, let's go back to when they could sell it to third parties, and they'd also sell it back to Nathan's. I don't know that they sold it back to Nathan's when they sold it to  There's no evidence in the record that they did that. So, previous to 97, they were never selling it back to Nathan's. That's our understanding. I'm not aware of any evidence in the record to the contrary. Okay, all right. And I tried the case. All right. So, after 97, it changed. But before that, they were always selling it to third parties. That's my understanding. And when they were selling it, they were paying Nathan's a royalty. Correct. And it's not like there's a lot of parties. I think it's like our client and maybe one or two other manufacturers. All right. We did all the retail business. So, if you go in the store, the stuff you buy in the store, I think they had another manufacturer for the stuff. If you go into a Nathan's restaurant out on the East Coast, we make some of that. But generally, I think they had a different manufacturer for that. So, it wasn't like there were a lot of manufacturers. So, when they make the change, our contractual right is you have to pass it through to us at cost, except for royalty. So, when they entered into that agreement in 97, it's very dispositive, the language of the agreement. It says specifically, one, there's going to be a discount. And then they amended it, you ask how many times? They amended it five times. And used this language. Used this language of rebate five times. And as the volumes increased over those years, the rebate went up. Why do you get to challenge this language in an agreement that has nothing to do with it? Because our rights directly flow from it, Your Honor, and that's exactly what comes out of 2.10. 2.10 absolutely describes this relationship. So, are you claiming you're a third-party beneficiary? We're not claiming it. We didn't claim, well, that we were a third-party beneficiary. We claimed that our rights flow from it. And I think there's a difference. And what is that based on? But, I mean, we could. What is that based on? What principle of law is that based on? Well, the principle of law of the cases that we also cite that say, when your rights are affected by the underlying contract, you have the ability to assert. I mean, we're not asserting. All that we're asserting as to that claim is that, as our rights, we're asserting under our contract. As to their contract, all we're asserting is the contractual rules of construction, which say no parole evidence. And, by the way, we have challenges about the things they say about the parole evidence. What about the conduct of the parties that clearly indicates that everyone involved with this contract, not your contract, but the contract between Morrell and Nathans is that this was a royalty and they accounted for it as a royalty. And their dealings established over the period of time that they've been involved with each other that it was always a royalty. Okay. I guess two things. One is we say, unless you can identify the ambiguity, you never get to that. And they have never been able to identify any ambiguity in the language of the contract. Wait, wait, wait. Is this 1997 amendment part of a broader contract or not? Yes. All right. So, is there an ambiguity in this new provision as it's contained in this broader agreement? No, there's not. In fact, one of the things that's helpful. Should the court have granted summary judgment on that? Absolutely. The court should have granted summary judgment because we also have, in the broader agreement that it's an amendment to, an integration clause. And the case law is very clear. All right. And I was going to ask you that. So, there is an integration clause that says this is the entire agreement of the parties? Correct, Your Honor. Now, do you agree that we're looking at New York law or Illinois law? New York law. All right. And then, Your Honor, I would say as to, you know, there's sort of a concept of, you know, would you provisionally look at the evidence to see was there some ambiguity? I mean, the court did have all of this evidence before him as when he entered summary judgment, when he made the decision that none of this other evidence should be, you know, in both the parole evidence. But he did have that, and it was all briefed before him. And I just want to say, for purposes of the court, going back to your question, which is we don't agree with what they're claiming the evidence was, too. I mean, the reality is is they didn't account for this as a royalty until years after 97. For 97 through, like, 2000, they were accounting for it differently. They were accounting for this. Well, when did all this? And so, post, my point, though, is that, you know, to explain even if you were allowed to have this parole evidence. It doesn't count what you did three years later. In 1999, for example, what were they doing in terms of their accounting? My understanding, my recollection of the evidence is from 1997, 98, 99, they were accounting for it as the revenue or profits on their receipts. And there was some issue, I think there was some testimony. It was never really clear why they changed it. But there was some issue about is it their public company, just like we're a public company, is it misleading on their sales and so forth, the way they're accounting for it? What New York case relates to the integration clause that happened? The New York cases relating to the integration clause are the cases we cited, which are the Oxford Communications case, Your Honor, which states, this is the Oxford Communications v. Landau at 239 New York South 2nd at 865. It says, it is clear that in the case of a fully integrated agreement where parole evidence is offered to vary its terms, the rule operates to protect all whose rights depend upon the instrument, even though they were not parties to it. So that's the Oxford case. And we also cited the Vince Aguirre case, which has similar language in it, to contracts that are fully integrated, Your Honor. So as to the specimen, the judge just got it right. There is no ambiguity. You can't even manufacture an ambiguity. They don't really ever say what the ambiguity is. All they say is, it's like, sure, that's what it says, but we all agree now it means something different. Now, on a very minor point, you say the trial court erred in concluding that this agreement included, as far as the change of ownership, included SMG affiliates. You say the court erred by expanding that? Yes, Your Honor. That would be in the context of another basis on which you could affirm parole. I understand. My question to you is this. Don't you have to file a cross appeal to challenge that ruling if you're going to rely on it now? My understanding, when we looked at it, Your Honor, we did not have to file a cross appeal. That fell in the category of other bases for which the court could affirm. All right. Including the notice. Yes, and on the note, I'll just say a couple things since you all asked about it, the counsel about it is, our position on this is very clear. Look, we're business partners with them. We told them all about this refinancing. After the mad cow scare that had occurred, our margins were being squeezed and our company was in breach of its loan covenants. So Nathan's, the testimony is very clear. I crossed their CEO on this. They were getting paid every penny of their royalties, even if we weren't making any money. They never gave us a break on it. They never said take a break because, you know, they never gave us any relief whatsoever. We're in breach of our loan covenants. The only financing we could get were under these convertible debentures, which all the testimony was unequivocal is debt. We got these debt instruments. We explained exactly to them what was happening. We gave it to them in writing. We had meetings with them. We gave them press releases that described all these things. And the reasons we were telling them this was not because we had to, about the viability of our company at the time. And, in fact, their president testified it would have been a disaster for Nathan's had we not got this financing. And what they did was they let it all go through. They let all the financing happen. They let the deal close, and then they started to complain. Did the directors, did the board of directors ever change in any of those previous transactions that had been essentially okayed by Nathan's, you know, before? I think the members of the board had changed. Some of them had, and there had been different changes at different times, like when they went public, as to how many could elect and so forth. Would you say that there is any difference at all between the prior changes as far as SMG versus this last transaction that they're saying changed everything? No, not at all. I mean, the most significant thing that occurred is when they went public with the Canadian IPO. And that was approved, or they didn't consider it a change of ownership or the other triggering provision? No. And, in fact, they had notice of it. They had the copy of the prospectus. They knew what happened. So now you can't control who your shareholders are because you're a public company. The reality is is when there's a dispositive provision on this, and that's Section 2.7 of our agreement, which can be found at page 26 of our brief. Section 2.7 talks about the royalties. And embedded in 2.7, there's a defined term of change of control. And we've set it forth at page 26 of our brief. Change of control, in all of the case laws, if you make a specific definition of a change of control, you can't trump that. So the only place this agreement talks about, and specifically, so the specific trumps the general, specifically talks about change in board vote and control of voting shares is in 2.7. They completely ignore it. Do you believe this was a change of control? It's not a triggering event. I don't think that they would argue that. But is that something you're not willing to concede? Right. It's not a triggering event. Change of control. It's not a change of control for this reason because change of control is a defined term. Change of control is defined as when Chemical Ventures Partners ceases to control the board votes, basically. Right? That happened. That happened years ago. It was a one-time event. They consented to it. It has in the contract a single remedy. The remedy is to recalculate your royalties, the minimum royalties. They could go up or down based on the formula, by the way. There's no remedy of termination for a change of control. So they're out of the box on Section 2.7, change of control. They completely ignore it, and they have no response to that in their briefs. They have no response to the fact that change of control is specifically defined. They don't meet the terms, and it does not allow for termination. All right. Anything further? That's all I have. Can I just ask one question? Sure. Sorry to take you back to this place. That's okay. The agreement between you and Nathan says that the costs pass along, but not including the royalties. Later, in 97, when the new agreement is formed, it basically just abolishes royalties, right? Yes. There's no more royalties. Correct. So this first agreement that I mentioned that between SMG and Nathan's says we've got to pass along our costs outside of royalties. Now, in 97, there's no more royalties. Does the fact that royalties were abolished, does that then make that ambiguous? Does that create an ambiguity? No, it doesn't because they have specific language. Because now you're talking about something that doesn't exist. I had it on the board here, but, Your Honors, it all seemed to be very first with it. But this is the provision they put in. This is why there's no ambiguity. They put a whole paragraph in that says no royalty on sales to NFSI, and it ends with saying that Morrell has no responsibility to pay royalties to NFSI on sales made to NFSI. So there can't be an ambiguity, Your Honor, in our view, because there's a specific provision. Not only does this amendment say what they are entitled to, which is a discount, it says what they're not entitled to. So it says what it is, and it says what it's not. So in our view, there's absolutely no ambiguity, and you can't manufacture an ambiguity by saying, you know, later on we got amongst ourselves and decided, hey, let's call it a royalty because it's more beneficial to us. I hope that answered your question. Thank you. All right. Briefly? Just a couple of small points. Your Honor had previously raised the issue of where we identify the fact of a modification of a contract by performance. Very specifically, it's raised at page 33 of our brief. So I just wanted to make sure we were clear on that point. As to 2.7 and the fact that the contract otherwise deals with change of control, we do address this, and we make pretty clear that these are not mutually exclusive options here. You may recalculate royalties at the end of the day, royalties that they say otherwise don't exist, but you can recalculate royalties, but that doesn't mean that you can't operate 4.2 and 2.7. So that's how we address that matter. And then the last point is there's a lot of references to us letting a deal through, but I just want to make the overarching point that we weren't able to stop that deal. Our right is to terminate the contract. That's what rights we had after we had a fully disclosed trigger event under 4.2. Oh, and one last point. The case that I personally believe explains this entire what it is, in fact, not having a non-third-party beneficiary rely on a separate contract is the SIN matter, which we cited earlier. I want to ask you this. Sure. What is your response to the New York law, which tracks Illinois law, regarding an integration clause? Your Honor, an integration clause in terms of. This contract has an integration clause, does it not? The council said it did. The Morrell contract, Your Honor. Yes. Yeah, sure, yes. But I don't, to be honest, I'm not entirely sure where that would get them in terms of, you know, our entire point is that, you know, literally they're receiving a windfall, okay? Nathan's has accounted for this. It's taken, you know, it's taken this money in. The other side, its counterparty, agrees that these are royalties. Nobody disputes that. In that world, the world that's affected by the contract, in the separate universe where SMG is trying to impose a construction that is contrary to the party's performance, they say they get $6 million. It's quite literally a windfall. And, frankly, it leads to an absurd result because all of that money, and this is a company that licenses out its brand, this is how it does generate revenues, all that money is gone. Now it's going to go to SMG because SMG gets to decide, not Morrell and not Nathan's. SMG gets to decide what, in fact, Nathan's received. It's just contrary to New York law. Well, they had some control. Couldn't they have modified this, the agreement with SMG by saying we're changing the language from royalty to something else, but this is what we want you to pay? If that's the case, your company is at fault for doing that. Well, Your Honor, our company would indeed be at fault if they were, in fact, a third-party beneficiary. And let me just say he identifies them. When he says they are a direct, their rights directly flow from that contract, that is New York law for a third-party beneficiary. That is not what they argued here, nor do we think it's supportable. So for them to have been, to receive their rights directly from this contract, they would have to be a third-party beneficiary. They concede that they're not. And in the event that they were, guess what? We would know to speak to them. Okay? That's third-party, that's why you have third-party beneficiary law. So you don't have, frankly, this Michigas where everybody's sort of wondering around what everybody's doing. They had no rights under that contract. Their trigger is under their contract, and it's what's actually received from Nathan's. And for that, the evidence is uncontroverted. Thank you. All right. The case was well-argued and well-briefed and will be taken under advisory.